# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### WHITE PLAINS COURTHOUSE

| | |
|---|---|
| Selina Valencia, individually and on behalf of all others similarly situated, | 7:23-cv-01399 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Snapple Beverage Corp., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. Snapple Beverage Corp. ("Defendant") manufactures and sells fruit beverages described as "All Natural" despite containing ingredients such as chemical preservatives under the Snapple brand ("Product").



**I.   ALL NATURAL MISLEADING DUE TO CHEMICAL OF CITRIC ACID**

2. Consumers understand natural as meaning nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected.

3. This is consistent with this term's definition as existing in or caused by nature and not made or caused by humankind.

4. A large majority of consumers prefer foods with natural instead of artificial ingredients for several reasons.

5. First, over half of consumers believe that foods with artificial ingredients are less healthy compared to those with only natural ingredients.

6. Second, more than half of the public wants to consume foods that are closer to their original form, instead of having been highly processed.

7. Third, consumers believe that foods with natural ingredients are better for the environment than those laden with synthetic ingredients and made through artificial processes.

8. Fourth, "the preference for natural products appeals to a moral ideology and offers a moral satisfaction."[1]

9. According to a recent Nielsen survey, a significant majority of consumers are willing to pay more for foods with natural ingredients as opposed to artificial ingredients.

10. The statement of "All Natural" is false, deceptive and misleading because the ingredient list reveals the Product contains citric acid, an artificial ingredient.

---

[1] Rozin, P., Spranca, M., Krieger, Z., Neuhaus, R., Surillo, D., Swerdlin, A., & Wood, K. (2004). Preference for natural: Instrumental and ideational/moral motivations, and the contrast between foods and medicines. Appetite, 43(2), 147-154.



FILTERED WATER, SUGAR, APPLE AND PEAR JUICE CONCENTRATES, CITRIC ACID, VEGETABLE AND FRUIT JUICE CONCENTRATES (FOR COLOR), NATURAL FLAVORS.

11. Until demand outstripped supply in the early twentieth century, the only citric acid was natural, from citrus fruit.

12. For over a hundred years, none of the production of citric acid has been natural because it is made beginning with fermentation from the *Aspergillus niger* mold.

13. The result is a broth containing citric acid, which must be recovered through numerous chemical reactions with synthetic mineral salts and reagents.

14. First, the filtrate is treated with lime solution or calcium carbonate.

15. This chemical reaction forms tri-calcium citrate tetra hydrate, treated with sulfuric acid in acidolysis reactors.

16. Second, the solution is purified by passing through activated charcoal columns and ion exchangers and evaporated to recover citric acid.

II.  ADDED COLORING INCONSISTENT WITH ALL NATURAL

17. The definition of natural includes the absence of added color, regardless of source.

18. Consumers do not expect the Product to have added color in the form of "Vegetable and Fruit Juice Concentrates (For Color)," rendering All Natural misleading.



FILTERED WATER, SUGAR, APPLE AND PEAR JUICE CONCENTRATES, CITRIC ACID, VEGETABLE AND FRUIT JUICE CONCENTRATES (FOR COLOR), NATURAL FLAVORS.

19. While this coloring is from natural sources, it is not from apple and pear juices.

20. The result is that the Product looks darker, like it contains more apple juice than it

3

does.

### III. FAILURE TO DISCLOSE CITRIC ACID AS PRESERVATIVE MISLEADING

21. A preservative is something that, when added to food, preserves or has the power of preserving, i.e., to protect against decay, deterioration, discoloration, or spoilage.

22. This includes maintaining or improving safety, freshness, nutritional value, taste, texture and appearance.

23. These functions can be achieved through natural preservatives like sugar, salt, vinegar, and spices, or artificial preservatives like ascorbic acid, citric acid, benzoate of soda, salicylic acid, and sulfur dioxide.

24. In response to consumer outcry based on the unregulated environment where dangerous substances were added to the nation's food supply, the Pure Food and Drug Act of 1906 required disclosure of chemical preservatives to inform purchasers about the contents of what they were buying.

25. This requirement was maintained when the Federal Food Drug and Cosmetic Act ("FFDCA") was enacted. 21 C.F.R. § 101.22(a)(5), 21 C.F.R. § 101.22(c).

26. These rules were adopted by every state so consumers could make informed decisions about the foods they buy.

27. Consumer opposition to preservatives is just as strong today as a hundred years ago, confirmed by research from Nielsen and Mintel indicating that almost ninety percent of Americans are willing to pay more for healthier foods, understood as without synthetic preservatives.

28. That the use of undisclosed chemical preservatives remained prevalent and significant to consumers was affirmed by the advisory issued by the International Food Information Council ("IFIC") and Food and Drug Administration ("FDA") that the public look at

the "Names Found on Product Labels" via the ingredient list for ingredients including "[A]scorbic acid, citric acid [and] sodium benzoate," among other chemical additives.[2]

29. That reviewing a product's ingredients should be sufficient to tell consumers of the use of chemical preservatives is based on the requirement that "[A] food to which a chemical preservative(s) is added shall [] bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its function, e.g., 'preservative', 'to retard spoilage', 'a mold inhibitor', 'to help protect flavor' or 'to promote color retention'." 21 C.F.R. § 101.22(j).

30. The FDA has even warned companies whose products "contain[ed] the chemical preservatives ascorbic acid [and citric acid] but their labels fail[ed] to declare [them] with a description of their functions [and] declared by their common or usual names," which it deemed "misbranding," and thereby capable of misleading consumers.[3]

31. Nowhere on the Product, including on the ingredient list, are purchasers informed that citric acid is a chemical preservative.



FILTERED WATER, SUGAR, APPLE AND PEAR JUICE CONCENTRATES, CITRIC ACID, VEGETABLE AND FRUIT JUICE CONCENTRATES (FOR COLOR), NATURAL FLAVORS.

32. While apple juice and a beverage containing apple juice is mildly acidic with a pH between 3.5 and 4.4, making it difficult for microorganisms to survive, some pathogens may not be destroyed by heat processing.

33. The addition of citric acid serves multiple preservative functions related to the safe consumption of apple juice beverages.

---

[2] Overview of Food Ingredients, Additives & Colors, Apr. 2010.
[3] FDA Warning Letter to Chiquita Brands International, Inc. and Fresh Express, Incorporated, Oct. 6, 2010 (relying on 21 C.F.R. § 101.22(j) and 21 C.F.R. § 101.4(a)).

34. First, by adding what one preservative manufacturer calls "the most commonly used acidulant in the industry," citric acid increases the acidity of apple juice, lowering its pH and making it less conducive to microbial organisms.

35. Second, as an antimicrobial agent, citric acid prevents the growth and production of toxic molds known to exist in apple juice such as *Aspergillus parasiticus* and *A. versicolor*.

36. Third, citric acid acts in several ways to inhibit the activity of polyphenoloxidase ("PPO"), responsible for enzymatic browning in apple juice.

37. This process results in negative effects on color, taste, flavor, and nutritional value of apple juice.

38. Numerous academic and industry studies confirm citric acid's effectiveness in inhibiting the activity of PPO.

39. First, because polyphenol oxidase activity thrives with higher pH levels, adding the acidulant of citric acid to lowers the pH of apple juice inactivates PPO.

40. Second, because the PPO enzyme contains copper, citric acid functions as a chelating agent by binding to metal cofactors in its enzyme structure to suppress PPO activity.

41. Third, because PPO thrives with oxygen, citric acid's role as an antioxidant reduces enzymatic browning by preventing oxidation.

42. By preventing enzymatic browning, citric acid preserves the Product by preventing it from spoiling prematurely, so it is consumable and shelf-stable for a longer period of time after being made.

43. By preventing the negative effects of PPO on the Product's color, taste, flavor, and nutritional value, consumers will believe it is higher quality than it is, even though this is achieved by using a chemical preservative.

IV. **MISLEADING DECLARATION OF SERVING SIZE**

44. The labeling is misleading because the Nutrition Facts lists the calories and nutrients based on a serving size of 8 oz and the full 16 oz bottle.



45. Research demonstrates that package and portion sizes have a considerable impact on the amount of food consumed.

46. While a consumer may hope to consume part of the bottle – 80 calories – evidence suggests otherwise, and they will consume the entire bottle.

47. Consumers will generally consume an entire beverage when it is packaged and presented in a 16 oz bottle.

48. By presenting the Nutrition Facts in the dual column format, it is inconsistent with the information required to maintain healthy dietary practices by implying that it is reasonable to consume less than the entire container.

49. This is inconsistent with federal and identical state requirements, by which the reference amount customarily consumed ("RACC") for non-carbonated beverages is 12 oz (360 mL).

50. The Product's 16 oz size is 133 percent of the RACC, which meets the regulatory

definition for a single-serving container.

51. This means the serving size is the entire bottle, not the 8 oz indicated. 21 C.F.R. § 101.9(b)(6).

## Jurisdiction and Venue

52. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

53. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

54. Plaintiff is a citizen of New York.

55. Defendant is a citizen of Delaware and Texas.

56. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

57. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here from convenience stores, supermarkets, drugstores, big box stores and online in the States Plaintiff seeks to represent.

58. Venue is in this District with assignment to the White Plains Courthouse because a substantial part of the events or omissions giving rise to these claims occurred in Westchester County, including Plaintiff's purchase, reliance on the identified statements, use of the Product and experiences described here and subsequent awareness they were false and misleading.

## Parties

59. Plaintiff Selina Valencia is a citizen of Eastchester, Westchester County, New York.

60. Defendant Snapple Beverage Corp. is a Delaware corporation with a principal place of business in Plano, Texas.

61. Defendant is a leading seller of non-carbonated juice drinks.

62. As a result of the false and misleading representations, the Product is sold at a premium price of $1.99 for 16 oz, excluding tax and sales.

63. Plaintiff purchased the Product at stores including but not necessarily limited to Stop & Shop, 420 White Plains Rd, Eastchester, New York, in the fall and/or winter of 2022, and/or among other times, at or around the above-referenced price.

64. Plaintiff sought a juice beverage that was all natural, which she understood as not containing synthetic or chemical ingredients and added coloring, without chemical preservatives, and that truthfully disclosed its nutrition and calories based on how purchasers will consume it, i.e., the entire bottle.

65. Plaintiff read the words "All Natural" and did not know citric acid was a chemical preservative.

66. Plaintiff paid more for the Product than she would have had she known the representations and omissions were false and misleading, or would not have purchased it.

67. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

Class Allegations

68. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Wyoming, Idaho, Iowa, and Montana who purchased the Product during the statutes of limitations for each cause of action alleged.

69. Common questions of issues, law, and fact predominate and include whether

Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

70. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

71. Plaintiff is an adequate representative because her interests do not conflict with other members.

72. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

73. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

74. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

<u>New York General Business Law ("GBL") §§ 349 and 350</u>
<u>(New York Class)</u>

75. Plaintiff incorporates by reference all preceding paragraphs.

76. Plaintiff expected the Product was all natural, which she understood as not containing synthetic or chemical ingredients and added coloring, without chemical preservatives, and that truthfully disclosed its nutrition and calories based on how purchasers will consume it, i.e., the entire bottle.

77. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>
<u>(Consumer Fraud Multi-State Class)</u>

78. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are

similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

79. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

80. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

81. The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it was all natural, which she understood as not containing synthetic or chemical ingredients and added coloring, without chemical preservatives, and that truthfully disclosed its nutrition and calories based on how purchasers will consume it, i.e., the entire bottle.

82. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

83. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet their needs and desires, which was a product without synthetic and non-natural ingredients, and nothing not expected, and a healthy caloric choice.

84. The representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it was all natural, which she understood

as not containing synthetic or chemical ingredients and added coloring, without chemical preservatives, and that truthfully disclosed its nutrition and calories based on how purchasers will consume it, i.e., the entire bottle.

85. Defendant's representations affirmed and promised that the Product was all natural, which she understood as not containing synthetic or chemical ingredients and added coloring, without chemical preservatives, and that truthfully disclosed its nutrition and calories based on how purchasers will consume it, i.e., the entire bottle.

86. Defendant described the Product so Plaintiff believed it was all natural, which she understood as not containing synthetic or chemical ingredients and added coloring, without chemical preservatives, and that truthfully disclosed its nutrition and calories based on how purchasers will consume it, i.e., the entire bottle, which became part of the basis of the bargain that it would conform to its affirmations and promises.

87. Defendant had a duty to disclose and/or provide non-deceptive promises, descriptions and marketing of the Product.

88. This duty is based on Defendant's outsized role in the market for this type of product, a leading seller of non-carbonated juice beverages.

89. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

90. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

91. Defendant received notice and should have been aware of these issues due to complaints by consumers and third-parties, including regulators and competitors, to its main offices and through online forums.

92. The Product did not conform to its affirmations of fact and promises due to

Defendant's actions.

93. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if it was all natural, which she understood as not containing synthetic or chemical ingredients and added coloring, without chemical preservatives, and that truthfully disclosed its nutrition and calories based on how purchasers will consume it, i.e., the entire bottle.

94. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected that it was all natural, which she understood as not containing synthetic or chemical ingredients and added coloring, without chemical preservatives, and that truthfully disclosed its nutrition and calories based on how purchasers will consume it, i.e., the entire bottle, and she relied on its skill and judgment to select or furnish such a suitable product.

### Fraud

95. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was all natural, which she understood as not containing synthetic or chemical ingredients and added coloring, without chemical preservatives, and that truthfully disclosed its nutrition and calories based on how purchasers will consume it, i.e., the entire bottle.

96. Defendant's actions were done with awareness of the importance consumers attribute to the words natural and all natural.

### Unjust Enrichment

97. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Certifying Plaintiff as representative and the undersigned as counsel for the classes;

2. Awarding monetary, statutory and/or punitive damages and interest;

3. Awarding costs and expenses, including reasonable attorney and expert fees; and

4. Other and further relief as the Court deems just and proper.

Dated:   February 19, 2023

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com